MID–WEST CONVEYOR COMPANY, INC., Plaintiff,

v.

JERVIS B. WEBB COMPANY, Defendant.

Civ. A. No. 93–2539–EEO.

United States District Court, D. Kansas.

Feb. 3, 1995.

Emily Jane Bailey, Martin, Leigh & Laws, Kansas City, MO, Charles B. Lyon, Mitchell G. Blair, Calfee, Halter & Griswold, Cleveland, OH, David L. Skidgel, Watson & Marshall L.C., Kansas City, MO, for plaintiff Mid–West Conveyor Co. Inc.

Joseph B. Bowman, Carter H. Kokjer, Devon A. Rolf, Kokjer, Kircher, Bowman & Johnson, Kansas City, MO, for defendant Jervis B. Webb Co.

### MEMORANDUM AND ORDER

EARL E. O'CONNOR, Senior District Judge.

This declaratory judgment action was tried to the court on December 12, 1994. Plaintiff Mid–West Conveyor Company, Inc., ("Mid–West") seeks a declaration that a license agreement entered into between Mid–West and defendant Jervis B. Webb Company ("Webb") grants Mid–West and its affiliate, Dearborn Fabricating & Engineering Company, a non-exclusive, worldwide license to manufacture, use and sell, or have manufactured for use and sale, conveyor systems incorporating inventions disclosed and claimed in Webb's United States Patent No. 4,616,570. Webb maintains that the license is not worldwide in scope, but is limited to the United States.

After reviewing all the evidence and the arguments of counsel, the court makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

### Findings of Fact

1. Mid–West is a Delaware corporation with its principal place of business in Kansas. Mid–West and Dearborn Fabricating & Engineering Company are wholly-owned subsidiaries of Tomkins Industries. Webb is a Michigan corporation with its principal place of business in Michigan.

2. Mid–West and Webb are competitors who are both engaged in the manufacture and sale of unit-handling conveyor systems for numerous industries, including the automotive industry.

3. Webb is the owner of United States Patent No. 4,616,570 (the "'570 patent"). The subject matter disclosed and claimed in the '570 patent is a transfer mechanism for power and free conveyor systems, and is sometimes referred to as the "wide-dog" transfer. The transfer mechanism is used to transfer objects, such as automobile bodies, from one conveyor to another in conveyor systems.

4. In addition to the '570 patent, Webb owns several corresponding foreign patents for the wide-dog technology disclosed and claimed in the '570 patent, including patents in Canada and France.

5. In 1988, Mid–West and Webb's Canadian subsidiary competed with each other for a contract to supply conveyor systems to General Motors at its plant in Ste. Therese, Quebec, Canada. Mid–West was awarded the contract in the summer of 1988.

6. In late 1988, Michael McClellan, the president of Mid–West Conveyor, contacted Jervis H. Webb, the president of Webb. McClellan told Mr. Webb that Mid–West had been awarded the contract for the General Motors plant in Ste. Therese, Canada, and that Mid–West desired to use the wide-dog transfer technology on that job. Mid–West was aware at this time that Webb owned U.S. and Canadian patents on the wide-dog technology. Mid–West requested a license to utilize the wide-dog technology on the Ste. Therese project, and on future projects. Mr. Webb informed McClellan that David Webb Clark, the vice-president of engineering, was the person within the Webb organization responsible for licensing and patents, and that McClellan should direct his inquiries to Clark.

7. During the negotiation process, McClellan expressed to Clark an interest in obtaining a license agreement that would apply not only to the Canadian project, but would extend to future jobs. In a letter to Clark, dated December 19, 1988, McClellan stated:

> Our thought is that the license would initially cover 89 transfers at the General Motors facility in Ste. Therese and *that it could be extended to other projects on the same basis.* (Emphasis added.)

8. In a January 25, 1989, letter to Clark, McClellan repeated Mid–West's position that the license would encompass the Ste. Therese project, and all future projects:

> We have reviewed your letter and would like to offer this counter proposal of $1,200 for each transfer and $100 per carrier or 2½% of the total sell price, whichever is lower. This would provide a fee of $194,400 for the St. Therese project *and would be applicable to all future projects.* (Emphasis added.)

9. In response to this letter, Clark sent McClellan draft copies of a license agreement accompanied by a cover letter dated January 27, 1989. The cover letter stated:

> Enclosed are two copies of a license agreement *incorporating terms as outlined in your letter to me dated January 25, 1989* with the exception that we have deleted the royalty payment based on a percentage of sell price. (Emphasis added.)

At the time McClellan received the letter and draft license proposal, he believed the license agreement was for all future projects of Mid–West, without territorial limitation. McClellan testified this belief derived from Clark's express statement in the January 27 letter that the license incorporated the terms of McClellan's January 25, 1989, letter, which included the language that the agreement would apply to the Ste. Therese project and "would be applicable to all future projects."

10. Mid–West added Dearborn Fabricating and Engineering Company to the draft license agreement as a licensee along with Mid–West, and forwarded signed copies of the revised draft agreement to Webb on February 9, 1989.

11. Except for the addition of Dearborn as a licensee, the final version of the license agreement is identical to the original draft license, which was prepared in its entirety by Webb.

12. On February 17, 1989, Clark forwarded fully executed copies of the license agreement to McClellan. The fully executed license agreement was identical to that enclosed with McClellan's letter of February 9, 1989. The license agreement was signed by Clark, as secretary of Webb, by McClellan as president of Mid–West, and by J. Wes Paisley as president of Dearborn.

13. Paragraph two of the license agreement contains a grant clause, which reads, in pertinent part:

> *License grant.* WEBB hereby grants to MID–WEST, and MID–WEST hereby accepts, a non-exclusive, non-transferrable license to manufacture, use and sell, or have manufactured for use and sale by MID–WEST, power and free conveyor systems incorporating any invention disclosed and claimed in the Licensed Patent, and such conveyor system being hereinafter referred to as a Licensed System.

14. The grant clause does not include any recitation that the license right granted is limited to the United States. Nor does the license agreement include a definition of any territory limiting the geographical scope of the license.

15. The license agreement also contained a choice-of-law clause. Paragraph nine of the agreement stated as follows:

> *Applicable law.* This Agreement shall be deemed a contract made under the laws of the State of Michigan, and shall be construed and interpreted in accordance therewith.

16. Clark had both the apparent and actual authority to negotiate and sign the license agreement on behalf of Webb. During the entire negotiation process, Clark never suggested to McClellan that Clark's authority to grant foreign licenses was circumscribed in any way. Specifically, Clark never told McClellan that Webb or Webb International had other license agreements in place, including counterpart foreign patents to the '570 patent, and Webb's Canadian patent. During the entire negotiating period, Clark never showed McClellan any preexisting license or technical assistance agreements.

17. At no time during the entire negotiation process did Clark, or any other representative of Webb, express to McClellan the position that Webb construed the scope of the license agreement as limited to the United States only. The negotiations were entered into in contemplation of a project in a foreign country, Canada. McClellan testified

that he would not have signed an agreement limited to the United States.

18. Clark testified that during negotiations with McClellan, Clark was aware Mid–West was seeking a license for any future projects it might enter into:

Q: And you were aware that Mid–West Conveyor was looking for a license that they could use in any future application, were you not, sir?

A: Yes, I was.

Q: And during this time, Mr. Clark, in or about December and into January of 1989, you didn't talk to Mr. McClellan about a limit on where Mid–West could practice their wide-dog, did you, sir?

A: I don't recall discussing limits on where it could be practiced.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: Alright. But indeed you'll agree with me, won't you, sir, that no limits on where the wide-dog technology could be used were discussed between you and Mr. McClellan; isn't that true?

A: I agree with that.

19. At the time Clark signed the agreement, he understood that the license agreement extended to projects outside the United States:

Q: Now at the time you signed this license agreement, Mr. Clark, there was no question in your mind, was there sir, that the license agreement applied to jobs at least in the United States and Canada; isn't that true, sir?

A: That is true, United States and Canada.

20. Clark believed the license grant in paragraph two of the license agreement accommodated McClellan's desire for a license with respect to any future project by Mid–West:

Q: Now, at or about this time, which is January 27 of 1989, you had not told ... Mr. McClellan ... that you interpreted this language, [paragraph two of the license agreement] to restrict in any way Mid–West's ability to practice the wide-dog technology, isn't that true, sir?

A: That is true. I did not discuss any specific limitations or restrictions.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: ... There is no limitation in paragraph two, is there, Mr. Clark, to where Mid–West could utilize the wide-dog technology?

A: There is no limitation stated in that paragraph.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: It's true, isn't it, Mr. Clark, that you believed that the language in paragraph two accommodated Mr. McClellan's desire for a license with respect to any future project by Mid–West Conveyor; isn't that correct?

A: That is correct.

21. The assets of Webb include various license agreements with companies in foreign countries. These license agreements were part of a global licensing program, and were entered into prior to the license agreement with Mid–West.

22. Each of the grant clauses contained in these license agreements includes express language that the agreement is geographically limited to the territories defined therein. As examples, the grant clause of the license agreement between Webb and Pianelli & Traversa Española, S.A., a Spanish corporation, reads in pertinent part:

*Grant of License.* WEBB hereby grants to LICENSEE for the life of this Agreement the exclusive license to manufacture and the non-exclusive license to sell WEBB PRODUCTS in the Territory.

The grant clause of the license agreement between Webb and Consorcio en Ingenieria Fabricantes, S.A., a Mexican corporation, contains identical language.

23. Each of these license agreements specifically defined the territory covered by the agreement. For example, the Webb/Pianelli license includes the following definition of territory: "For the purpose of this agreement, the term 'territory' means the following countries: Spain including the towns of

Ceuta and Melilla and the Canary Islands; Portugal; [and] Former Portuguese and Spanish Colonies that is: Azores Islands, Madeira Islands, Cape Verde Islands, Angola, Mozambique, Port, Guinea, IFNI, Spanish Sahara, Rio Muni, Fernando Poo." The Webb/Consorcio license agreement provided the following definition of territory: "For the purpose of this Agreement, the term 'Territory' means the following countries: Mexico; Central America."

24. Owen Newell, former Chief Financial Officer of Webb, testified that the territorial definition was an express statement of the geographical scope of these agreements.

25. Newell admitted that during the negotiation and drafting of the license agreement between Mid–West and Webb, he was aware the agreement was negotiated in the context of a project in Canada. Notwithstanding that knowledge, the license agreement included no territory definition and failed to include any language in the grant clause geographically restricting the license agreement.

26. After signing the license agreement, Mid–West paid Webb royalties on its U.S. and foreign jobs, totalling approximately $544,000. Of that amount, Mid–West paid $257,800 in royalties for foreign jobs. These foreign jobs included two projects in Ste. Therese, Canada, and one in China; all used the wide-dog technology.

27. Webb unconditionally accepted the royalties Mid–West paid for all domestic and foreign jobs. Webb never threatened to sue Mid–West for its use of the wide-dog technology in foreign countries. Webb admitted that it accepted the royalties Mid–West paid on the Canadian jobs in order to avoid the need to enter into an additional license of Webb's corresponding Canadian patent.

28. In late 1991 or early 1992, Mid–West took steps to bid on a General Motors project in Australia that included several conveyor transfers. In preparing Mid–West's bid, McClellan concluded that he needed to ascertain whether Webb owned a patent in Australia, which would require Mid–West to pay a license fee. In response to McClellan's telephone inquiry in early 1992, Clark stated that Webb had patent coverage in Australia that would prohibit Mid–West's sale of wide-dog technology in that country. Clark followed up this oral statement with a letter, dated February 28, 1992, stating the position that Mid–West's license was limited to the United States only.

29. McClellan testified that the first time Webb made known its position that the license was limited to the United States was in early 1992, three years after the license agreement was signed.

30. The position Clark espoused to Mid–West in early 1992 (that Mid–West's license was limited to the United States) differed from the position Clark had previously articulated in internal discussions with his colleagues at Webb:

Q: Now, at the time that this matter became a dispute and you spoke with Mr. McClellan, it's true, isn't it, Mr. Clark, that at first you were unsure of the geographic scope of the license Agreement, international will define that to be other than the U.S. and Canada; isn't that true?

A: That is true, outside of the U.S. and Canada.

Q: And the reason you were unsure is because as you relayed internally to the people at Webb, you didn't profess to know what this language meant precisely; isn't that true?

A: I want to be sure I answer that correctly. Up to that point, projects outside of the United States and Canada had not come up. At the time that the contract was—or license, excuse me, was being negotiated, in my own mind I had been thinking about the United States and Canada. Maybe incorrectly so, but just based on my understanding such as it was of Mid–West's business activities. So when the international project outside of the U.S. and Canada came up, I wasn't sure how the license would cover that type of project because it doesn't say one way or the other.

Q: And, in fact, the reason you weren't sure is because you didn't believe the

language was clear on that issue; isn't that true?

A: It's not clear either way.

Q: Now, you relayed to the people at Webb that you as principal negotiator of the License Agreement were not sure of the scope geographically of that agreement; isn't that true, sir?

A: In our own internal discussions, that is true. I was not sure, and I expressed that as to what the contract truly said in terms of that.

31. Clark acknowledged that Webb had considered the fact that an interpretation of Mid–West's license agreement restricting its scope to the United States would improve Webb's competitive position against Mid–West in bidding on future projects:

Q: Now, when this dispute arose, you will agree with me, won't you, Mr. Clark, that you did discuss competitive reasons with your people at Webb why the license agreement would be restricted in scope; isn't that true?

A: In terms of where it could be utilized on international projects, yes, that is true, we talked about that.

Q: And specifically that if Mid–West couldn't use the wide-dog, it might add to the price if they had to use an alternate method on jobs that both Webb and Mid–West were bidding; isn't that true?

A: That is true.

32. Notwithstanding the position Webb adopted in early 1992, that Mid–West possessed a license restricted to the United States, it continued to accept royalties on foreign jobs. Since January 1992, Webb has accepted from Mid–West $85,200 in royalties on foreign jobs that utilized the wide-dog technology.[1]

*Conclusions of Law*

It is well-settled that where federal jurisdiction is based upon diversity of citizenship, a federal district court "must apply the choice-of-law rules of the forum state, ... including the forum state's rule as to whether a contractual choice-of-law provision is enforceable." *Equifax Services, Inc. v. Hitz,* 905 F.2d 1355, 1360 (10th Cir.1990) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941), and *Interfirst Bank Clifton v. Fernandez,* 853 F.2d 292, 294 (5th Cir.1988)). Kansas law recognizes the enforceability of choice-of-law provisions like the one contained in paragraph nine of the parties' license agreement. *Equifax Services, Inc. v. Hitz,* 905 F.2d 1355, 1360 (10th Cir.1990); *Mark Twain Kansas City Bank v. Cates,* 248 Kan. 700, 706, 810 P.2d 1154, 1159 (1991). Therefore, the license agreement shall be construed and interpreted in accordance with the laws of Michigan. *See Lear, Inc. v. Adkins,* 395 U.S. 653, 661–62, 89 S.Ct. 1902, 1906–07, 23 L.Ed.2d 610 (1969) (construction of patent license agreements governed by state law). However, inasmuch as the license agreement involves an invention described in a United States patent, the court will also look to federal decisions interpreting similar license agreements for guidance. *See MGA, Inc. v. LaSalle Machine Tool, Inc.,* 148 Mich.App. 350, 384 N.W.2d 159, 161 (1986).

"Patent license agreements are to be construed according to the general principles of contract interpretation and construction." *Cardinal of Adrian, Inc. v. Amerock Corp.,* 209 U.S.P.Q. 724 (E.D.Mich.1980) (citing 4 Anthony Will Deller, *Deller's Walker on Patents,* § 421 (1965)), *aff'd,* 698 F.2d 1218 (6th Cir.1982). Where language contained in a contract is unclear, a court must consider the circumstances of the parties'

---

1. In February 1993, Webb accepted a check from Mid–West in the amount of $28,400. Webb was aware the check was a royalty payment for a foreign job performed under the license agreement. The cover letter sent by Mid–West to Webb that accompanied the check stated, in part: "This is payment in accordance with the license agreement between our companies dated February [sic] 9, 1989. This payment is for 14 trans-

fers and 116 carriers installed at the GM Ste. Therese plant in Montreal, Quebec." In September 1993, Webb accepted a check in the amount of $56,800. The memo on the statement attached to the check read: "This payment is made under the Webb License Agreement dated February 9, 1989 in connection with a Mid–West Conveyor Project in Tiantin, China. 24 Transfers; 280 Carriers."

relationships and their conduct in order to ascertain their intentions at the time of drafting. *Id.* (citing *Stimac v. Wissman,* 342 Mich. 20, 69 N.W.2d 151 (1955)). At trial, the court determined that the language in the license agreement is ambiguous and susceptible of more than one interpretation. Thus, extrinsic evidence would be admissible in construing the territorial scope of the license agreement. *See Glenwood Shopping Center, L.P. v. Kmart Corp.,* 136 Mich.App. 90, 356 N.W.2d 281, 286–87 (1984).

■ For the reasons discussed below, the court finds that the extrinsic evidence presented at trial supports the conclusion that the license agreement grants Mid–West a geographically unrestricted license to manufacture, use and sell, or have manufactured for use and sale, conveyor systems disclosed and claimed in the '570 patent.

First, the conduct of the parties throughout the negotiation of the contract supports this interpretation. The license agreement was negotiated in the context of a project in Canada. Clark, the Webb officer authorized to negotiate and contract with Mid–West, through McClellan's letters of December 19, 1988 and January 25, 1989, was aware of Mid–West's intention that the license cover the conveyor transfers in the Ste. Therese, Canada project, and apply to all future projects. Indeed, Clark agreed to draft the license agreement, and stated in a January 27, 1989, letter that the license agreement "incorporat[ed] [the] terms as outlined in your letter to me dated January 25, 1989." Moreover, Clark testified that at the time he signed the agreement, he believed the license agreement extended to projects outside the United States. At no time during the negotiation process did Clark or any other Webb representative indicate an intention that the terms of the license agreement were to apply only to the United States.

■ Michigan adheres to the objective theory of contracts; a party's subjective intent or belief is irrelevant. *Lilley v. BTM Corp.,* 958 F.2d 746, 751–52 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992). "[A] meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Heritage Broadcasting Co. v. Wilson Communications, Inc.,* 170 Mich. App. 812, 428 N.W.2d 784, 787 (1988). Under the objective theory, the only intentions that are of consequence are those expressed. Notably, the only intentions expressed by Webb were those of Clark, and he communicated his intention to McClellan that the license agreement satisfy Mid–West's desire for a license applicable to the Ste. Therese, Canada, project and all future projects.

Additionally, the court finds that the post-negotiation conduct of the parties supports Mid–West's interpretation of the license agreement. Webb unconditionally accepted royalties for all of Mid–West's domestic and foreign projects, including royalties for jobs in Canada and China. Even after Webb declared its belief that Mid–West possessed a license restricted to the United States, it continued to accept royalty payments from Mid–West on foreign jobs that utilized the wide-dog technology.

Moreover, the express language of the license agreement fails to evidence any intent to limit the scope of the license to the United States. The grant clause includes no terms of restriction limiting Mid–West's right to manufacture, use, or sell conveyor systems incorporating the wide-dog technology to the United States. Webb contends, however, that the scope of the license is restricted to the time and territory of the patent. Webb argues that because the patent is a United States patent, the scope of the license itself is likewise restricted to the United States. Specifically, Webb asserts that the language "... and claimed ..." in the license grant provides territorial definition to the agreement. In support, Webb relies on *Cold Metal Process Co. v. United Engineering & Foundry Co.,* 235 F.2d 224 (3rd Cir.1955).

■ Mid–West maintains that references to a United States patent in a license agreement do not necessarily limit the agreement's scope to the United States, and that in this case, the patent is referenced in the license agreement merely to describe the specific technology licensed. As authority, Mid–West cites *Kabushiki Kaisha Hattori Seiko*

*v. Refac Technology Dev. Corp.*, 690 F.Supp. 1339 (S.D.N.Y.1988).

The court finds *Kabushiki* well-reasoned, and persuasive authority for Mid–West's position. In *Kabushiki*, the court addressed a nearly identical dispute arising from the interpretation of a similar license agreement. The license in *Kabushiki* contained the following grant clause:

> REFAC hereby grants to HATTORI and its related companies an irrevocable ... fully paid up, non-exclusive license for the entire term of each patent, to make, have made, use, have used, sell and have sold *products coming within the scope of* U.S. Patent Nos. 3,855,783; 3,744,049; 3,842,-589; 3,955,355, and 4,008,564 and all other Patents directed to or covering digital time pieces now owned or hereafter owned by Refac or its affiliates, and all non-U.S. counterparts of any of said Patents.

As in the case at bar, the parties in *Kabushiki* disagreed about the territorial scope of the license agreement. There, plaintiff sought, *inter alia*, a declaratory judgment that the license agreement was not geographically limited, but covered plaintiff's products wherever they were sold. The defendant argued, just as Webb in the instant case, that United States patents protect the right only to make, use or sell products within the United States, and therefore, a product is not "within the scope of" a United States patent when it is sold abroad.

The language critical to determining the breadth of the license was contained in the grant clause, which granted plaintiff a non-exclusive license "to make, ... use, ... [and] sell products coming within the scope of U.S. Patent Nos...." This language closely resembles the grant clause language at issue in the license agreement between Mid–West and Webb, which granted Mid–West a non-exclusive license "to manufacture, use, and sell ... systems incorporating any invention disclosed and claimed in the Licensed Patent." The court in *Kabushiki* specifically addressed and rejected an argument similar to Webb's here that references to a United States patent in a license agreement limit the agreement's scope to the United States:

A patent's "scope," as is well established in patent law, *refers not to the geographical area within which the patent provides protection,* but to the nature of the products covered by the patent's claims. The term "scope of a patent" has been defined as follows:

> "The *boundaries or limits of the invention protected by the patent,* which are not matters of metes and bounds and can never be defined in the definite sense employed in thinking of physical things, but must be determined by methods based upon established principles of patent law."

*Black's Law Dictionary* (5th ed. 1979) (emphasis added) (citation omitted). *See also Rhone–Poulenc Specialites Chimiques v. SCM Corp.*, 769 F.2d 1569, 1572 (Fed.Cir. 1985) ("The claim defines the scope, or limits, of the right to exclude conferred by the patent."); *Foster Wheeler Corp. v. Babcock & Wilcox Co.*, 512 F.Supp. 792, 799 (S.D.N.Y.1981) ("It is a fundamental rule of patent law that the claims of a patent determine its scope").

In interpreting an agreement concerning patents, "[t]echnical words ... must be taken in a technical sense unless the context of the instrument or a usage which is applicable clearly indicates a different meaning." *Nau v. Vulcan Rail & Construction Co.*, 286 N.Y. 188, 198, 36 N.E.2d 106 (1941). *See also* 6 E.B. Lipscomb III, *Lipscomb's Walker on Patents* §§ 20:58 at 204, 20:59 at 212 (3d ed. 1987) (terms with well-understood meaning in patent law normally given such meaning in interpreting patent licenses). Refac has pointed to nothing within the confines of the Agreement to warrant hesitation in concluding that the phrase "within the scope of U.S. Patent ...," as used in the Agreement, carries its usual meaning. *Therefore, that phrase does not geographically limit the license granted.*

*Kabushiki*, 690 F.Supp. at 1343 (emphasis added).

Webb attempts to distinguish *Kabushiki* on the grounds that the license agreement in that case contained a reference to "all non-U.S. counterparts of any said patents." *Ka-*

*bushiki* at 1341. Webb's argument is unpersuasive because there is no indication that the court relied on the "foreign counterpart" language of the license agreement in reaching its decision. Instead, the court, consistent with Mid–West's position herein, held that the license agreement was worldwide in scope (despite its reference to United States patents) because the referenced patents were used by the parties to identify the licensed inventions, rather than to limit the geographic scope of the agreement.

Webb's suggestion that the language "and claimed" was used to provide territorial definition to the license agreement ignores the well-settled use of the terms "claims" and "claimed" to describe the technical scope of patented inventions. *See id. See also* Chisum, *Patents: A Treatise on the Law of Patentability, Validity and Infringement* § 8.01 (1991) (noting that patent claims define the invention for the purposes of: (1) applying the conditions of patentability, and (2) determining infringement); Mayers and Brunsvold, *Drafting Patent License Agreements,* § 22.08 (1991) ("If the intent of the parties is to limit the patent rights to be transferred to a specific territory defined in the license agreement, express language and a schedule of licensed patents should be used to negate implications that otherwise arise.")

The case Webb relies upon in support of its position, *Cold Metal Process Co. v. United Engineering & Foundry Co.,* 235 F.2d 224 (3d Cir.1956), is factually distinguishable. There, the license agreement was expressly granted *under* a United States patent, that is, the only rights extended to the licensee were those created by the United States patent. *Id.* at 229. In other words, the subject matter of the license agreement in *Cold Metal* was the United States patent itself, rather than simply the technology described in the patent. Consequently, because a United States patent creates rights only within the United States, the court properly held that the licensee's contract rights were limited to the United States. Unlike the license agreement in *Cold Metal,* the subject matter of the instant license agreement is not the referenced patent, but rather conveyor systems incorporating inventions described in the '570 patent.

Even if *Cold Metal* is not factually distinguishable (*i.e.,* the grant clause language "under the patent" did not serve to restrict the licensee's rights to those created by the United States patent) we are not convinced the court's conclusion is sound. The court failed to reference any case law or other authority for its position, and in the thirty-eight years since the decision was rendered, it has not been relied upon in any subsequent case for the proposition espoused by Webb. We regard it as against the weight of authority. *See Kabushiki* and cases cited therein.

We conclude that the reference to the U.S. patent in the grant clause of the Mid–West/Webb agreement was used to define the technology for which a royalty would be due, not to limit where the technology could be used. In reaching this conclusion, the court is mindful of the fact that Webb drafted the license agreement. To the extent that the geographical scope of the license agreement is unclear, this aspect of the contract should be construed against Webb, the drafter of the document. *Petevello v. Murray,* 139 Mich.App. 639, 362 N.W.2d 857, 858 (1984); *Stegall v. Little Johnson Assoc., Ltd.,* 996 F.2d 1043, 1047 (10th Cir.1993). *See also Restatement (Second) of Contracts,* § 206 (1979) (rationale for rule that ambiguous agreement construed against drafter: where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests, and more likely than the other party to have reason to know of uncertainties of meaning; he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert). Had Webb, as the drafter of the agreement, intended to limit the geographic scope of the license, "it could and should have included appropriate words of restriction." *Kabushiki* at 1344.

Indeed, Webb knew how to define the geographical territory and limit the license grant to the geographical scope of the defined territory. Webb had done so explicitly in each of the license agreements it had entered into with companies in foreign countries as part of its global licensing program.

561

These agreements, which were presented to the court, were all entered into before the agreement between Webb and Mid–West.

In sum, the court will not construe the parties' license agreement to imply a territorial limitation where there is no express geographic limitation and no evidence that the parties either discussed or intended such a limitation at the time they entered into the agreement. The court concludes that the parties intended to grant Mid–West licensing rights in foreign countries, not just in the United States. Consequently, Mid–West is entitled to the declaratory judgment it seeks.

IT IS THEREFORE ORDERED that judgment be entered in favor of the plaintiff.